Filed 10/14/21

CERTIFIED FOR PARTIAL PUBLICATION[*]

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078848 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 215648) |
| LINDE SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Santa Clara County, David A. Cena, Judge.  Affirmed.

Jonathan D. Grossman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Karen Z. Bovarnick, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.A, C, E, and F.

# I.

# INTRODUCTION

During the guilt phase of a bifurcated trial, a jury found Linde Smith guilty of second-degree murder (Pen. Code, § 187)[1] and found true a deadly weapon enhancement allegation (§ 12022, subd. (b)(1)).[2] Smith's mother, Anne Smith (Anne), was the victim. During the sanity phase of the trial, the jury found that Smith was legally sane at the time she committed the offense. The trial court sentenced Smith to a term of 16 years to life in prison, consisting of a 15 years to life term for the murder and a one-year consecutive term for the deadly weapon enhancement.

On appeal, with respect to the guilt phase, Smith claims that the trial court erred in excluding certain evidence pertaining to the severity of her depression at the time of the incident giving rise to the charged offense. In addition, Smith contends that the trial court erred in failing to instruct the jury sua sponte on involuntary manslaughter as an uncharged lesser included offense to murder. Smith also maintains that the cumulative error doctrine requires reversal of the guilt-phase verdicts.

With respect to the sanity phase, Smith claims that the trial court violated her constitutional right to due process under *Doyle v. Ohio* (1976) 426 U.S. 610, 618 (*Doyle*) and its progeny by admitting evidence that she claims amounted to a comment on her exercise of her right to remain silent pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). She also maintains that the trial court erred in refusing to preclude an expert retained by the prosecution from testifying due to the People's alleged failure to timely

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2] The jury found Smith not guilty of first-degree murder.

provide the defense with the expert's report and related data.  Finally, Smith contends that the cumulative error doctrine requires reversal of the sanity verdict.

In a published portion of this opinion, we conclude that the trial court did not err in failing to instruct the jury on the lesser included offense of involuntary manslaughter because there is no substantial evidence in the record to support the giving of the instruction.  In another published portion of this opinion, we conclude that the trial court did not commit *Doyle* error. We reject the remainder of Smith's claims in unpublished portions of this opinion.  Accordingly, we affirm the judgment.

## II.

## FACTUAL BACKGROUND

A.  *Guilt-phase evidence*

1.  *Smith's mental illness*

Smith suffered from depression for many years.  In 1995, Smith began to see a psychiatrist, Dr. Alan Brauer, on a somewhat regular basis and continued to see him until shortly before her commission of the offense. Dr. Brauer testified that he had diagnosed Smith with both major depressive disorder and dysthymia, with the former being more severe and episodic, and the latter being a milder version of the disorder that was longer lasting. Dr. Brauer prescribed various psychiatric medications to Smith throughout the time that he treated her.  Smith also received care from a different physician, Dr. Schwartley, for a thyroid condition.

## 2. *Smith's December 2014 move into Anne's residence*

Smith moved into Anne's residence in December 2014.[3] After Smith moved in, Anne became concerned that Smith was sleeping excessively. She called Dr. Brauer's office to let him know that Smith was sleeping about 18 hours per day. Anne was also concerned about the amount of "stuff" that Smith owned. Anne's desire to give away Smith's clothes was a source of conflict between the two.

## 3. *The murder*

On August 12, 2015, during an argument, Smith hit Anne in the head repeatedly with a hammer, killing her.

## 4. *Smith's 9-1-1 call*[4]

The next afternoon, Smith called 9-1-1 and told the operator that she had killed her mother. Smith told the operator, "We had a terrible fight, and I killed her with a hammer." After Smith told the operator that the killing had taken place the prior day, the operator asked Smith why she had waited so long to call 9-1-1. Smith responded, "I just freaked out, and I was just trying to, I don't know, I was trying to sleep and pretend it didn't happen." When asked by the operator what the argument was about, Smith said that her mother was "gonna give all my clothes away." Smith added that she had "borrowed a lot of her [mother's] money," and also noted that she and her mother would both become "overwhelmed." Smith also told the 9-1-1 operator about her strange sleep patterns, which Smith stated was caused by antidepressants that she was taking.

---

[3] Smith testified that she had previously lived with Anne for approximately 21 days in 2013. According to Smith, she moved out and told Anne that she could not live with Anne.

[4] The 9-1-1 call was played for the jury during the trial.

4

5. *The investigation*

When police arrived, they found Anne's body in the living room. There was a hammer close to her body. Portions of Anne's skull were on the ground, eight to ten feet from her body, and her brain matter was exposed in the areas where the skull was missing. Anne suffered eight lacerations in the area above her left ear and behind her forehead, as well as extensive skull fractures and injuries to the brain. According to a medical examiner, Anne's cause of death was "[b]lunt force injuries including cranial cerebral injuries due to strikes by [a] hammer."

In addition to fatal head injuries, Anne had a number of defensive injuries consisting of lacerations and contusions on both forearms and on one of her hands, as well as fractures to her left wrist and forearm. Smith suffered no physical injuries.

Shortly after her arrest, while in a patrol car, Smith told a detective at the scene, "I killed my mom."

6. *The defense*

Smith testified and admitted killing Anne with a hammer. According to Smith, on the morning of the killing, she and her mother were packing up some of Smith's belongings that Anne had insisted Smith donate to charity. This was upsetting to Smith. While they were packing, Anne made several demeaning comments to Smith, and a heated verbal argument ensued.

During the argument, Smith picked up a hammer. Anne attempted to take the hammer from Smith and the two began to struggle. Smith hit her mother on the head with the hammer four times. Smith testified that she thought that the incident was a dream. Smith stated, "And I hit her with a hammer in the head, and I remember hitting her four times, all in a row, like really fast, and it was like a dream."

5

After killing her mother, Smith went to bed in the hope that the "dream" would end. She called the police the following morning and told the 9-1-1 operator that she had killed her mother.

Dr. Pablo Stewart, a psychiatrist, testified that Smith suffered from major depressive disorder and hypothyroidism. Dr. Stewart suggested that the evidence concerning the circumstances surrounding the killing could have caused Smith to act rashly and out of emotion or passion rather than judgment.

B. *Sanity-phase evidence*

1. *The defense's presentation of evidence of Smith's insanity*

The defense presented three mental health experts, each of whom opined that Smith was insane at the time of the killing. Two court-appointed experts, Dr. David Berke and Dr. Ashley Cohen, opined that Smith did not know the nature and quality of her acts and she did not appreciate that her acts were legally or morally wrong. The third expert, Dr. Stewart,[5] testified that, in his opinion, Smith knew the nature and quality of her acts, but did not know that her acts were legally or morally wrong.

All three experts diagnosed Smith as suffering major depressive disorder and hypothyroidism. In addition, each of the three experts stated that, in their opinion, Smith had suffered an episode of depersonalization and derealization—a mental disorder prompted by stress—at the time of the killing. Dr. Stewart described depersonalization and derealization as "sort of looking down at oneself being in some sort of a dream state, not being in full control of your body functions and your thought processes."

---

[5] Dr. Stewart was retained by the defense and he testified in both the guilt and sanity phases of the trial.

The doctors each interviewed Smith, and her statements during these interviews formed part of each doctor's assessment that Smith had suffered a dissociative experience at the time of the offense. For example, Dr. Stewart stated, "Based on my interview with her, which was confirmed by her testimony where she said she flipped out and that she was in a dream -- felt like she was in a dream, all of that is -- I'm convinced that she was in a period of depersonalization at the time of the crime." Dr. Berke stated that Smith had described herself as being like a passenger in a car and in a dream. Similarly, Dr. Cohen agreed with defense counsel that Smith had described her mental state at the time of the offense as "almost being two different people, one, a passenger in a vehicle, and one was driving the vehicle."

2. *The People's presentation of evidence of Smith's sanity*

The prosecution presented the testimony of psychologist Dr. Kris Mohandie. Dr. Mohandie opined that Smith's claim of being "out of body as if a passenger . . . in a vehicle," during the offense was "malingered," and "manufactured," and that Smith's claim of experiencing that "symptom [was] bogus." Dr. Mohandie's conclusion was based, in part, on his review of Smith's 9-1-1 call. Specifically, Dr. Mohandie pointed to Smith's "extraordinary sharing of information spontaneously in [the] 9-1-1 call," and the "emotionality," that she displayed during the call, both of which Dr. Mohandie stated, "you don't see if a person is out of body, if you will, or distancing themselves from what has happened." Dr. Mohandie also noted that Smith described the killing during the 9-1-1 call in a manner that indicated that she knew that the killing had happened, noting that Smith had said on the 9-1-1- call, " 'I tried to pretend that it didn't happen.' "

In addition, Dr. Mohandie stated that, during his interview of Smith, she used language that was "completely inconsistent with an out-of-body experience," including "us[ing] feeling terms when . . . describ[ing] the

7

violence that she inflicted upon her mother."[6] Dr. Mohandie also noted that in describing the events surrounding the killing during his interviews with her, Smith displayed "no hazing of consciousness," and that the "gestures that [Smith] ma[de] spontaneously while describing these things, [were] . . . inconsistent with some sort of out of body experience."

Another factor that caused Dr. Mohandie to "rule[ ] out," "derealization or depersonalization," was that Smith had not experienced dissociation on a recurrent basis. Dr. Mohandie noted that there was "no evidence of any dissociative or depersonalization experiences before or after." In addition, Dr. Mohandie noted that episodes of depersonalization and derealization are ordinarily prompted by "an acute stressor," and observed that "[t]here's nothing about that episode [before the killing] that's going to cause violence." Dr. Mohandie also stated that Smith had engaged in "goal-directed" behavior near the time of the offense, including retrieving a hammer, that was inconsistent with Smith's claim of having suffered a dissociative experience.

Dr. Mohandie supported his opinion that Smith was malingering by stating that there was evidence that Smith had engaged in malingering while incarcerated after her arrest. Specifically, Dr. Mohandie referred to an incident during which "[Smith] exaggerated and made suicidal statements as a way of trying to get her medications renewed or expedited." Dr. Mohandie also noted that there was evidence that Smith had reviewed a mental health report while she was undergoing mental health evaluations, which was "concerning," because it could "potentially . . . contaminate and educate [Smith] further even about how this process works." Dr. Mohandie did acknowledge that Smith had received a score of "honest responding," on a

---

6    During the sanity phase, the People played two video recordings of portions of Dr. Mohandie's interviews of Smith.

8

psychological test that he administered to her called the Structured Interview of Reported Symptoms (SIRS), which is designed to detecting malingering.[7]

Dr. Mohandie opined that at the time of the murder, Smith knew the nature and quality of her actions and knew that her actions were both morally and legally wrong. He believed that Smith was "absolutely sane."

III.

DISCUSSION

A. *Smith fails to establish any error with respect to either the trial court's limitation of the scope of Dr. Stewart's testimony or the trial court's exclusion of testimony pertaining to Smith's journal entries*

Smith claims that the trial court erred in excluding evidence during the guilt phase of the trial pertaining to the severity of her depression at the time of the incident. Specifically, Smith claims that the trial court erred in limiting the scope of Dr. Stewart's testimony concerning her level of depression at the time of the incident and excluding testimony pertaining to Smith's journal entries related to her depression. Smith claims that the evidence was relevant to rebut evidence that the People had presented to show that "[her] depression was not severe and [was] improving."

1. *The People's presentation of evidence pertaining to Smith's statements concerning her level of depression in 2014 and 2015*

Dr. Brauer testified that Smith told him during a July 2014 visit that she was "feeling better," and he noted that "she had low anxiety and mild depression" at that time. Dr. Brauer also stated that he spoke with Smith in

---

[7] Dr. Mohandie also administered the Minnesota Multi-Phasic Personality Inventory-II (MMPI-II) psychological test to Smith. Dr. Mohandie stated that the results of this test showed that there "was some tendency to over-endorse or exaggerate what was going on." Dr. Mohandie also testified that the MMPI-II was "picking up depression," and it "picked up . . . anxiety."

9

October 2014 and that she "described feeling minimally depressed and [having] low-level anxiety." Dr. Brauer further stated that Smith wrote in January 2015 that she was "feeling better." Finally, when asked how Smith appeared at an April 2015 visit, Dr. Brauer testified:

> "She was in pretty good condition. She reported -- in her handwriting again -- 'feeling better.' I judged her stable. She had no complaints. She mentioned that she was living with her mother in Sunnyvale, and my mental status exam, at that point, was unremarkable, you know, she was -- I noted her as being appropriate in appearance, appropriate in behavior, with mild depression and mild anxiety, not tearful, oriented times [three], no side effects, alert, no essential change in her mental status."

2. *Smith did not preserve her claim that the trial court erroneously limited the scope of Dr. Stewart's testimony*

a. *Factual and procedural background*

After the prosecutor called its last witness in the guilt phase, the trial court held a hearing with counsel outside the presence of the jury. During the hearing, the prosecutor indicated that both parties had "supplemental motions," with respect to Dr. Stewart's testimony.[8] The prosecutor indicated that he did not want Dr. Stewart to testify about Smith's sanity during the guilt phase of the trial.

In response, defense counsel stated that it was not her intention to have Dr. Stewart testify about "anything regarding sanity." Thereafter, the court clarified, "So we're not going to get into his examination of Ms. Smith, right?"

---

[8] Although it appears that the People and the defense drafted written motions concerning Dr. Stewart's prospective testimony, neither party cites to such motions in their brief on appeal and no such motions appear in the record.

10

Defense counsel explained that it was her intention "to introduce testimony that [Dr. Stewart] has diagnosed [Smith] with major depressive disorder . . . during his evaluation."

After the court expressed skepticism concerning the relevance of such a diagnosis, the prosecutor stated, "I don't believe that [Dr. Stewart] can get up here and testify about everything that the defendant told him . . . ."

After further discussions among the court, the prosecutor, and defense counsel concerning the scope of Dr. Stewart's testimony, the hearing concluded with the following colloquy:

> "[Defense counsel:] Is the Court concerned that these statements [that Smith made to Dr. Stewart during his interviews with her after her arrest] have not been introduced to the jury during the trial? Is that what the Court is concerned about?
>
> "[The court:] If that's what we're talking about -- if you want to say more than the generalized comments,[9] then there is no evidence of that.
>
> "[Defense counsel:] Okay.
>
> "[The court:] And I don't know how that comes in.
>
> "[Defense counsel:] Okay.
>
> "[The court:] Unless you call your client.
>
> "[Defense counsel:] Okay.

---

9      Earlier in the hearing, the trial court stated, "I have no problem with [Dr. Stewart] reviewing medical records, and saying that, you know, based on my review of the medical records, not based on my discussions with Ms. Smith, not based on my examination, not based on any tests, not based on anything that he did after August 13th of 2015[, the day after the murder], he can render his opinions, because I think that's fair game."

"[The court:] But I'm not going to let him come in and say, 'Well,' you know, 'I interviewed her in 2016, and she told me this, this, and this, and therefore, I believe that at the time of the incident, she was acting out of a rash impulse and not reason.'

"[Defense counsel:] Okay.

"[The court:] *I'm not going to allow that, okay? So we can go over it a little more at 1:30 to flesh it out or before the witness testifies so that there's no question about where you can go and what you can and cannot do with the witness.*

"[Defense counsel:] Okay.  Thank you.

"[The prosecutor:] Thank you."  (Italics added.)[10]

Smith testified during the defense's presentation of evidence.

The defense did not further discuss the scope of Dr. Stewart's testimony with the court prior to Dr. Stewart testifying.  During his testimony, Dr. Stewart stated that he had interviewed Smith on two separate occasions. Thereafter, the following colloquy occurred:

"[Defense counsel:] Now I'm going to ask you about your review of these records.  After reviewing Dr. Brauer's records, Dr. Schwartley's records, your interview with Ms. Linde Smith, interview with the different family members, did you have an opinion as to Ms. Smith's diagnosis?

"[Dr. Stewart:] Yes.

"[Defense counsel:] And what was that opinion?

---

10    The colloquy is taken from page 976 of the reporter's transcript.

12

"[Dr. Stewart:] After conducting the review that you just said, it was my opinion that Ms. Smith has suffered from major depressive disorder for an extended period of time."

b. *Governing law*

"Where the court rejects evidence temporarily or withholds a decision as to its admissibility, the party desiring to introduce the evidence should renew his offer, or call the court's attention to the fact that a definite decision is desired." (*People v. Holloway* (2004) 33 Cal.4th 96, 133, internal quotation marks omitted; see, e.g., *People v. Smith* (2003) 30 Cal.4th 581, 632 (*Smith*) [because defendant failed to renew request to admit certain evidence for specific reasons, he "may not now argue on that basis that its exclusion was error," citing Evid. Code, § 354]; cf. *People v. Young* (2017) 17 Cal.App.5th 451, 463 [reviewing court is barred from reaching an evidentiary claim pertaining to the exclusion of evidence that has not been adequately preserved, citing Evid. Code, § 354].)[11]

c. *Smith's claim on appeal*

Smith claims that the trial court erred in prohibiting Dr. Stewart from testifying that Smith was "was depressed at the time of the incident." The

---

[11] Evidence Code section 354 provides in relevant part:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that:

"(a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means; [or]

"(b) The rulings of the court made compliance with subdivision (a) futile[.]"

People argue in their respondent's brief that Smith cannot establish her claimed error because "the evidence she contends should have been admitted was admitted at trial and before the jury for its consideration." In response to the People's argument, Smith argues as follows in her reply brief:

> "Dr. Stewart's testimony that appellant had major depressive disorder for an extended period did not mean she was significantly depressed *at the time of the incident.* Even if the jury could infer this from his testimony, he provided no facts to explain why he reached an opposite conclusion from her treating psychiatrist. What was missing was that the opinion was based on specific information he obtained from evaluating appellant and that this was why he opined her depression continued to be significant up to the time of the incident. This is what the court excluded. [Citation.][12]

> "An opinion is only as good as the basis it rests on. [Citation.] A broad statement that Dr. Stewart interviewed appellant did not provide a factual basis for why he opined she was depressed at the time of the incident. Absent the presentation of new information obtained from the interview, the jury was left to conclude his opinion was simply his own interpretation of the same evidence the jury already heard. While this was partly true, Dr. Stewart's opinion was also based on specific facts obtained from the interview, which the jury was not allowed to hear."

### d. *Application*

During the trial court's discussion with the prosecutor and defense counsel, the trial court expressed reservations about permitting Dr. Stewart to testify to out-of-court statements that Smith made to Dr. Stewart during his evaluation of her. However, the court made clear that its ruling was subject to further consideration; the court stated, "we can go over it a little

---

[12] This citation is to page 976 of the reporter's transcript, which we quoted in part III.A.2.a, *ante.* (See fn. 10, *ante.*)

more . . . before the witness testifies so that there's no question about where you can go and what you can and cannot do with the witness." However, defense counsel never sought further clarification from the trial court as to the permissible scope of her examination of the witness.

Further, and critically, at no time during defense counsel's examination of Dr. Stewart did the trial court limit Dr. Stewart's testimony in any fashion. Specifically, at no time during Dr. Stewart's testimony did the trial court limit Dr. Stewart's testimony with respect to specific statements that Smith made to him during his examination of her, and there is no offer of proof or other record of such excluded statements in the record on appeal.[13] To the extent that the defense wanted to present, as Smith claims on appeal, "specific information [that Dr. Stewart] obtained from evaluating [Smith]," so that Dr. Stewart could explain "that this was why he opined [Smith's] depression continued to be significant up to the time of the incident," the defense was obligated to "renew [its] request" to admit such evidence for these specific reasons. (*Smith, supra*, 30 Cal.4th at p. 632.) The defense's failure to do so at any time during Dr. Stewart's testimony precludes Smith from arguing on appeal that the trial court erred in purportedly limiting Dr. Stewart's testimony (see *ibid.*) and precludes this court from reversing on that ground. (Evid. Code, § 354.)

Accordingly, we conclude that Smith did not adequately preserve her claim that the trial court erroneously limited the scope of Dr. Stewart's testimony.

---

[13] Indeed, Smith fails, even in her brief on appeal, to specify what "specific information," from Dr. Stewart's evaluation she was purportedly improperly prevented from presenting at trial.

15

3. *The trial court did not abuse its discretion in excluding testimony pertaining to Smith's journal entries*

    a. *Factual and procedural background*

The defense called City of Sunnyvale Detective Matthew Hutchinson as a witness. Defense counsel asked Detective Hutchinson whether he had had the opportunity to review "some journal entries that were made by Linde Smith in this case." Detective Hutchinson responded in the affirmative. Shortly thereafter, the following colloquy occurred:

> "[Defense counsel:] Is it true that Ms. Smith had journal entries about feeling depressed?
>
> "[The prosecutor:] Objection. Hearsay.
>
> "[The court:] Sustained. Can I see counsel in the hallway[?]"

After the conference in the hallway, defense counsel indicated that she had no further questions.

Subsequently, outside the presence of the jury, the following colloquy occurred pertaining to the court's exclusion of the testimony:

> "[Defense counsel]: Your Honor, in regards to Officer -- or Detective Hutchinson's testimony, the Defense sought to elicit testimony from the detective that he reviewed a journal that Ms. Smith had kept. In the journal, she made entries about feeling depressed, unmotivated, experiencing recurring nausea. I believe the Court -- there was an objection as to hearsay, the Defense believed that this was a prior consistent statement to rebut what Dr. Brauer had said regarding the fact that Ms. Smith had indicated her depression was under control.
>
> "[The court:] Do you want to say anything?
>
> "[The prosecutor:] Submitted.

16

"[The court:] All right. As I indicated, the questions had to do with the officer talking about entries in the journal that was found in the defendant's room, I guess. And at one point, when we were in the hallway, defense counsel said that she believed that these statements were prior consistent statements. If so, there was no intervening prior inconsistent statements such that they would become relevant, and to -- and I didn't think there was an adequate foundation for the fact that the journal was hers that could be laid by that witness, and so I precluded that testimony."

   b. *Governing law and standard of review*

Evidence Code sections 1236 and 791 pertain to the admissibility of prior consistent statements of a witness. Evidence Code section 1236 provides:

> "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 791."

Evidence Code section 791 provides:

> "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:

> "(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or

> "(b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

17

Evidence Code section 1202 pertains to evidence offered to attack or support the credibility of a hearsay declarant and provides in relevant part:

> "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

We review a trial court's evidentiary rulings for an abuse of discretion. (See, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence].)

      c. *Application*

On appeal, Smith argues that testimony concerning the journal entries was admissible under Evidence Code section 1202 to impeach Dr. Brauer's testimony that Smith had "reported to him only mild depression and she was feeling better."[14] In other words, Smith claims that the evidence was

---

[14] In her opening brief, Smith also appears to assert that her journal entries were admissible pursuant to Evidence Code sections 791 and 1236 as evidence of her prior consistent statements. The journal entries were not admissible pursuant to sections 791 and 1236 because these sections pertain to the prior consistent statements of "a *witness*" (§§ 791, 1236, italics added), and at the time Smith sought admission of the statements at trial, she had not yet testified and was therefore not a witness. Smith acknowledges this fact in her reply brief, stating:

> "[Smith] was not called as a witness before Hutchinson testified. At that time, it was her *out of court statements* that the defense sought to address." (Italics added.)

admissible to attack the statements that Dr. Brauer attributed to Smith pertaining to her mental health during several medical appointments in 2014 and 2015. (See *People v. Baldwin* (2010) 189 Cal.App.4th 991, 1005 [stating that when a defendant seeks to admit his or her extrajudicial statements pursuant to Evidence Code section 1202 such statements are "admissible solely to attack the credibility of the defendant as a declarant in the party admissions used against him" (italics omitted)].[15] This argument fails because the only offer of proof as to the content of the journal entries was defense counsel's statement that "[i]n the journal, [Smith] made entries about feeling depressed, unmotivated, experiencing recurring nausea." Defense counsel did not, however, discuss the time frame to which the journal entries referred. Generic statements that, at some unspecified times, Smith was feeling depressed, did not reasonably impeach evidence of her own statements to Dr. Brauer, made during medical appointments in 2014 and 2015, that she was " 'feeling better.' "

Accordingly, we conclude that Smith has not demonstrated that testimony as to the journal entries was admissible pursuant to Evidence

---

Further, when Smith did testify at trial, she did not offer the journal entries as prior consistent statements to support her *trial testimony*. Rather, the only time that Smith sought admission of the journal entries was during Detective Smith's testimony to, as Smith states in her brief, "impeach [her] *extrajudicial statements*." (Italics added.) The trial court did not abuse its discretion in refusing to admit evidence of the journal entries pursuant to Evidence Code section 1202, for the reasons stated in the text.

[15] Smith acknowledges in her brief that her extrajudicial statements to Dr. Brauer during her medical appointments were "admissible as statements by a party opponent (Evid. Code, § 1220) . . . ."

19

Code section 1202.[16] The trial court thus did not abuse its discretion in excluding testimony pertaining to the journal entries.[17]

B. *The trial court did not err in failing to instruct the jury on the uncharged lesser included offense of involuntary manslaughter because there is no substantial evidence in the record to support the giving of the instruction*

Smith claims that the trial court erred in failing to instruct the jury, sua sponte, on involuntary manslaughter as an uncharged lesser included offense to the charged offense of murder. Specifically, Smith contends that the jury could have found her guilty of involuntary manslaughter based on her "either committing felony assault with a [deadly] weapon[18] or acting with criminal negligence."

1. *Standard of review*

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218 (*Cole*).) In considering whether the trial court had a sua sponte duty to instruct the jury on lesser included

---

[16]    In light of this conclusion, we need not consider the People's contention that the trial court properly excluded the testimony because the journal entries had not been properly authenticated.

[17]    In light of our conclusion that the trial court did not abuse its discretion in excluding the evidence, we further conclude that the trial court's ruling did not violate Smith's constitutional right to due process as the "erroneous exclusion of critical corroborative defense evidence." (See, e.g., *People v. Riccardi* (2012) 54 Cal.4th 758, 809 ["The routine and proper application of state evidentiary law does not impinge on a defendant's due process rights"].)

[18]    Smith refers to the offense as "assault with a weapon" in one portion of her brief. However, in the modified CALCRIM No. 580 jury instruction that she claims should have been given, Smith refers to the underlying offense as to which she claims an involuntary manslaughter instruction should have been given as "assault with a deadly weapon."

offenses, we construe the evidence in the light most favorable to the appellant. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368.)

    2. *Governing law*

        a. *A trial court's duty to instruct on lesser included offenses*

"A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, ' "that is, evidence that a reasonable jury could find persuasive" ' [citation], which, if accepted, ' "would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser.*' [Citation.]" (*Cole, supra,* 33 Cal.4th at p. 1218.) In other words, "[s]uch instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense." (*People v. DePriest* (2007) 42 Cal.4th 1, 50.)

        b. *Substantive law*

          i. *Murder and manslaughter*

In *People v. Brothers* (2015) 236 Cal.App.4th 24, 30–31 (*Brothers*), the court discussed the relationship between murder and manslaughter, both voluntary and involuntary. The court began by outlining the elements of murder, including the element of malice:

> "Murder is 'the unlawful killing of a human being, or a fetus, with malice aforethought.' [Citation.] '[M]alice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' [Citation.] It is implied when the defendant engages in conduct dangerous to human life, ' "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' [Citation.]' (*Id.* at p. 30.)

The *Brothers* court explained that "both voluntary and involuntary manslaughter are lesser included offenses of murder." (*Brothers, supra,*

21

236 Cal.App.4th at p. 30.)  After describing voluntary manslaughter, the *Brothers* court described involuntary manslaughter as follows:

> "Involuntary manslaughter, in contrast, [is the] unlawful killing of a human being without malice.  (§ 192.)  It is statutorily defined as a killing occurring during the commission of 'an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection.'  (§ 192, subd. (b).)  Although the statutory language appears to exclude killings committed in the course of a felony, the Supreme Court has interpreted section 192 broadly to encompass an unintentional killing in the course of a noninherently dangerous felony committed without due caution or circumspection."  (*Id.* at p. 31.)

The *Brothers* court concluded that an instruction on  "involuntary manslaughter as a lesser included offense must [also] be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an *inherently* dangerous *assaultive* felony."  (*Brothers, supra*, 236 Cal.App.4th at p. 34, italics added.)[19]

---

[19]    The *Brothers* court reached this conclusion after first explaining that, ordinarily, "when [a] homicide occurs during the commission of an *inherently* dangerous felony, the homicide may be murder under the felony-murder rule, irrespective of the presence or absence of malice."  (*Brothers, supra*, 236 Cal.App.4th at p. 31, italics added.)  However, the *Brothers* court noted that, under the "merger doctrine" (*id.* at p. 31, fn. 5), when the underlying felony is an *assaultive* crime, the assault merges with the homicide, and application of the felony-murder rule is prohibited.  (*Id.* at p. 31.)  The *Brothers* court ultimately concluded that "an unjustified homicide in the course of an inherently dangerous assaultive felony (that is, a killing not amounting to felony murder) and accomplished without malice is . . . involuntary manslaughter."  (*Id.* at p. 32.)

ii. *Mental illness and malice*

Prior to legislative changes adopted in 1981, a defendant was able to present evidence that she lacked the *capacity* to form malice. (See *People v. Elmore* (2014) 59 Cal.4th 121, 135 ["Diminished capacity was a judicially created concept," that "allowed defendants to argue that because of mental infirmity, they lacked 'awareness of the obligation to act within the general body of laws regulating society,' and therefore were incapable of acting with malice"]; see *id.* at p. 138 ["The 1981 amendments make clear the Legislature intended to eliminate the notion of diminished capacity"].)

In *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1208 (*McGehee*), the court summarized the current state of the law pertaining to the relevance of evidence of a defendant's mental illness and malice:

> "While diminished capacity no longer mitigates an intentional killing to voluntary manslaughter [citation], a defendant 'is still free to show that because of his [or her] mental illness or voluntary intoxication, he [or she] did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought). [Citation.] In a murder case, if this evidence is believed, the only supportable verdict would be involuntary manslaughter or an acquittal. If such a showing gives rise to a reasonable doubt, the killing (assuming there is no implied malice) can be no greater than involuntary manslaughter.' ([Citation]; see also § 28, subd. (a) ['Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged'].)
>
> "Thus, in a murder case, instructions on involuntary manslaughter are required where there is substantial evidence that may come in the form of evidence of the defendant's mental illness, raising a question as to whether or not that defendant actually formed the intent to kill." (*Ibid.*)

### iii. *Assault with a deadly weapon*

"[A]ssault with a deadly weapon is a general intent crime; the required mens rea is 'an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another.' " (*People v. Perez* (2018) 4 Cal.5th 1055, 1066 (*Perez*).)

### 3. *Application*

As discussed in part III.B.2.a, *ante*, it is well established under California law that in order for a trial court to have a sua sponte duty to instruct on a lesser included offense, there must be " 'evidence from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." ' " (*People v. Wilson* (2021) 11 Cal.5th 259, 298 (*Wilson*).) Thus, in order for Smith to prevail on her claim that the trial court erred in failing to instruct the jury sua sponte on involuntary manslaughter based on her commission of an assault with a deadly weapon, there must be evidence from which a reasonable jury could find that Smith committed an assault-based involuntary manslaughter, but not murder based on express or implied malice. Our review of the evidence presented during the guilt phase reveals no such evidence.

With respect to her commission of the homicide, Smith testified that, just before the killing, the victim made several comments that Smith considered to be demeaning. Smith became emotional and picked up a hammer. According to Smith, the victim attempted to take the hammer away from Smith. After a physical struggle, Smith described the events that ensued:

> "And I still had the hammer in my hand, and she was to my left, and I was right next to her. And I hit her with a hammer in the head, and I remember hitting her four

24

times, all in a row, like really fast, and it was like a dream. And I heard the sound, it was her skull cracking. And then I could feel something that it felt like I hit, like, Jello. And something about that, like, snapped me back into, like, what was going on. And I looked down at my mom, and she was bleeding and her head was -- was wounded, and I suddenly realized that I had done this and I started saying, 'Mommy, oh my God, Mommy, I'm sorry.' "

In light of this testimony, we assume for purposes of this opinion that the jury could have found that Smith was in a dream-like state at the time of the killing and lacked express or implied malice while repeatedly striking the victim in the head with a hammer. However, if the jury so found, the jury could *not* also have found that Smith, while acting in a dream-like state, had the intent to commit an assault with a deadly weapon.[20] Specifically, a jury that found that Smith was in a dream-like state and without malice while hitting her mother in the head with a hammer could not also have found that, at the same time, Smith committed an " '*intentional* act [with] *actual knowledge* of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another.' " (*Perez, supra*, 4 Cal.5th at p. 1066, italics added.) That is because there is no evidence in the record from which the jury could reasonably find that Smith, while acting in a dream-like state, was, at the same time, acting

---

[20]    In her brief on appeal, Smith asserts, without citation to any evidence in the record, that *"[w]hile she had the intent to assault*, it was not so clear in light of her mental illness, she had malice or the intent to kill." (Italics added.)  As discussed in the text, our review of the record reveals no evidence upon which a trier of fact could find that she lacked malice but "had the intent to assault."

intentionally.[21] Further, because the commission of an assault requires an intentional act, a reasonable jury could not find that Smith was in a dream-like state and also find that she was acting in an intentional manner sufficient to commit an assault. Because there was no evidence that would have supported a conclusion that Smith committed the lesser offense of an assault-based involuntary manslaughter, but not the greater offense of murder, no lesser included offense instruction on involuntary manslaughter was warranted. In short, Smith either committed murder, voluntary manslaughter,[22] or no offense at all.

We acknowledge that there are broad statements in case law suggesting that, when a defendant is charged with murder, an instruction on involuntary manslaughter is required *whenever* the jury could find that the defendant lacked an intent to kill. (See *McGehee, supra*, 246 Cal.App.4th at p. 1208 ["[I]n a murder case, instructions on involuntary manslaughter are required where there is substantial evidence that may come in the form of evidence of the defendant's mental illness, raising a question as to whether or

---

[21] At oral argument, Smith's counsel argued that, although Smith knew that she was hitting her mother in the head repeatedly with a hammer and thus had the intent to commit an assault, because of her mental illness and emotional state, she did not appreciate the dangerousness of such act. However, we see no evidence in the record, including Smith's testimony recounted above, from which a reasonable jury could make such a finding. Stated differently, there is no evidence that any dissociative state under which Smith was acting at the time of the offense operated in this peculiar manner, i.e., there is no evidence that Smith's mental state was such that that she maintained an understanding that she was hitting her mother in the head repeatedly with a hammer, but lacked sufficient cognition to " ' "know[ ] that [her] conduct endanger[ed] the life of another." ' " (*Brothers, supra*, 236 Cal.App.4th at p. 30.)

[22] The trial court instructed the jury on voluntary manslaughter based on heat of passion.

not that defendant actually formed the intent to kill"]; *People v. Rogers* (2006) 39 Cal.4th 826, 884 (*Rogers*) ["An instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant did not actually form the intent to kill"].)[23]  However, we understand the law to be that, in order for a trial court to have a sua sponte duty to instruct on involuntary manslaughter, there must be substantial evidence from which the jury could find that the defendant lacked express or implied malice, *but committed the lesser included offense of involuntary manslaughter.*  (*People v. Abilez* (2007) 41 Cal.4th 472, 515 [" 'If the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter, failing to instruct on involuntary manslaughter would violate the defendant's constitutional right to have the jury determine every material issue' "].)  To conclude that an involuntary manslaughter instruction is required in *every* case in which a jury could find that a defendant committed a killing but lacked malice would do away with the bedrock principle that an uncharged lesser included offense instruction is required only if there is substantial evidence upon which a jury could find both that the defendant did *not* commit the greater offense, but *did* commit the lesser.  (See, e.g., *Wilson, supra*, 11 Cal.5th at p. 298.)  We aware of no authority that would support such a conclusion and decline to reach it here.

---

23    The formulations in *McGehee* and *Rogers* also should not be read to suggest that murder requires proof an "intent to kill," (*McGehee, supra*, 246 Cal.App.4th 1208; *Rogers, supra*, 39 Cal.4th at p. 884), since implied malice murder does *not* require proof of such intent.  (See, e.g., *People v. Fontenot* (2019) 8 Cal.5th 57, 80 ["murder . . . requires an act causing the death of another, but not the intent to kill, as implied malice will suffice"]; *People v. Gonzalez* (2012) 54 Cal.4th 643, 653 [same].)

We also are not persuaded by Smith's contention that there was substantial evidence supporting an involuntary manslaughter instruction based on her having acted with criminal negligence. (Citing *People v. Glenn* (1991) 229 Cal.App.3d 1461.) In *Glenn*, the Court of Appeal concluded that an involuntary manslaughter instruction was required because "[p]art of [the defendant's] testimony suggests the stabbing [that resulted in a homicide] was accidental." (*Id.* at p. 1465.) The testimony from which the Court of Appeal reached this conclusion was the following:

> "Glenn [the defendant] testified he removed the knife from his waistband and placed it in his lap while he sat at the counter. When he got up from the counter and started walking toward the door he tried, at the same time, to put the knife back in his pants. As he was walking and trying to slip the foot-long knife back into his pants he heard the victim coming up behind him. The victim appeared about to grab Glenn and, in a reflex action, Glenn turned with the knife in his hand and the knife entered the victim's chest causing a fatal wound. Glenn stated, 'I didn't try to stick it. It's just that when he turned--when I turned and he is coming, and it just happened like at the same time.'" (*Id.* at pp. 1465–1466.)

There was no comparable evidence in this case from which a jury could have reasonably found that Smith's acts in striking the victim in the head repeatedly with a hammer was accidental.

Accordingly, we conclude that the trial court did not err in failing to instruct the jury on the lesser included offense of involuntary manslaughter, because there is no substantial evidence to support the giving of the instruction.[24]

---

24    In the alternative, Smith argues that defense counsel provided ineffective assistance in failing to request an instruction on involuntary manslaughter. Given our conclusion that there is no substantial evidence to

C. *Smith is not entitled to reversal of the guilt phase verdict pursuant to the cumulative error doctrine*

Smith contends that the cumulative effect of the errors that she alleges occurred during the guilt phase requires reversal of the guilt-phase verdict. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) We have found no errors to cumulate. Accordingly, we conclude that the cumulative error doctrine does not require reversal of the guilt-phase verdict.

D. *The trial court did not err in admitting evidence during the sanity phase of the trial that Smith had not described being in a state of depersonalization or derealization prior to her evaluation with Dr. Stewart*

Smith claims that the trial court erred in admitting evidence during the sanity phase that Smith had not described being in a state of depersonalization or derealization prior to her evaluation with Dr. Stewart. She contends that the evidence was inadmissible as violative of her constitutional right to due process under *Doyle, supra*, 426 U.S. 610 and its progeny because it amounted to a comment on her exercise of her right to remain silent after having been advised of her rights under *Miranda, supra*, 384 U.S. 436.

---

support the giving of an involuntary manslaughter instruction, we reject Smith's ineffective assistance claim. (See *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836 ["Defense counsel's failure to request instructions on unreasonable self-defense and lesser included offenses based on that theory did not constitute ineffective assistance of counsel," because instructions were not supported by the evidence or the law and "[c]ounsel's failure to make a futile or unmeritorious motion or request is not ineffective assistance" (italics omitted)].)

We assume for purposes of this decision that the de novo standard of review applies in determining whether the trial court violated Smith's constitutional right to due process under *Doyle*. (See *People v. Seijas* (2005) 36 Cal.4th 291, 304 ["independent review 'comports with this court's usual practice for review of mixed question determinations affecting constitutional rights' "].)[25]

1. *Factual and procedural background*

    a. *Pretrial and guilt phase background*

Prior to the trial, in a motion in limine, the People stated that they intended to offer in evidence Smith's statements to the 9-1-1 operator and to a police officer immediately after her arrest. However, the People indicated that they did not intend to introduce in evidence during their case in chief

_____

[25] Smith also contends that "[a]t the very least, the evidence should have been excluded under Evidence Code section 352." She also appears to contend that the trial court erred in admitting the evidence because it was irrelevant. Smith did not assert Evidence Code section 352 or relevancy objections in the trial court and as a result, her appellate claims on these grounds are forfeited. (See Evid. Code, § 353 [providing in part that a "verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].)

Smith also broadly asserts that trial counsel was "ineffective to the extent she failed to make a proper objection or motion," (capitalization omitted) but fails to present any argument that trial counsel's failure to make an Evidence Code section 352 or relevancy objection amounted to ineffective assistance. Accordingly, this line of argument is forfeited as well. (See, e.g., *People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4 ["an argument raised in . . . perfunctory fashion is waived"].) Accordingly, we address in the text the claim that Smith properly preserved in the trial court and on appeal, i.e., her claim of *Doyle* error.

Smith's interview at the police station shortly after she was arrested because the interview contained statements that Smith made after invoking her right to counsel.

During the guilt phase of the trial,[26] the People introduced in evidence a recording of Smith's 9-1-1 call and statements that she made to a police officer in a patrol car immediately after her arrest.

### b. *Dr. Stewart's testimony on direct examination during the sanity phase*

During direct examination in the sanity phase of the trial, Dr. Stewart described to the jury the documents that he reviewed in preparing for his psychiatric evaluation of Smith:

> "[Defense counsel:] Okay. Now, in this case, you were hired to conduct the psychiatric evaluation of Ms. Smith. What documents did you review in preparation for that evaluation?
>
> "[Dr. Stewart:] Police reports, medical records, including the 20-plus years that she was in treatment with Dr. Brauer, the Santa Clara County Jail medical and psychiatric records."

Dr Stewart also extensively discussed Smith's jail records, which documented that Smith had been placed on a psychiatric hold while in jail awaiting trial.

Dr. Stewart also testified, "I'm convinced that [Smith] was in a period of depersonalization at the time of the crime."

---

[26] The parties stipulated that the jury could consider all evidence offered during the guilt phase in the sanity phase.

c. *The prosecutor's cross-examination of Dr. Stewart and the defense's* Doyle *objection*

The prosecutor asked Dr. Stewart whether he had asked Smith "about deliberation," and what Smith had said in response. Dr. Stewart responded:

> "I asked her if she had planned to kill her mother and she said no, she was in this dream-like state where she didn't have control over her mental processes or control of her body, and had a hammer in her hand and then she was in this state, observing herself hitting her mother and that during the course of the hitting, she -- as she has testified to and as she told me, she said she snapped out of it when she felt the hammer going into her mother's head. That's what she said."

Shortly thereafter, the following colloquy occurred during which the trial court overruled defense counsel's *Doyle* objections:

> "[The prosecutor:] All right. Now, you talked to [Smith] in May of 2017; is that correct, thereabouts?
>
> "[Dr. Stewart:] September of '16.
>
> "[The prosecutor:] Okay. But your report was May of 2017?
>
> "[Dr. Stewart:] Correct.
>
> "[The prosecutor:] Okay. So you talked to her in September?
>
> "[Dr. Stewart:] And January of '17.
>
> "[The prosecutor:] January of '17. Okay. Was that the first time, to your knowledge, that [Smith] mentioned this idea of depersonalization and derealization?
>
> "[Defense counsel:] Objection, Your Honor. *Doyle* error.
>
> "[The court:] Overruled.

32

"[Dr. Stewart:] She never mentioned depersonalization or derealization.

"[The prosecutor:] She didn't use those words because that's not in her vocabulary, but was that the first time, to your knowledge -- and granted, this jury already knows that you reviewed all the jail records and you reviewed all the police records and so you reviewed all the statements of everyone concerned, okay -- was that the first time that she mentioned, when you met with her, this idea of being outside of herself or being in a car or not acting within herself?

"[The prosecutor:] Same objection, Your Honor.

"[The court:] Overruled.

"[Dr. Stewart:] In my review of the police records, I don't remember her describing that exact -- using those exact terms of being in a dream state. I believe she said she got in an argument with her mother and ended up hitting her with a hammer. But to answer your question, I'm unaware of if [or] when she told me that, that that was the first time. She may have said it to someone else that I'm not aware of."

Immediately thereafter, the prosecutor asked Dr. Stewart whether Smith had suggested having been in a state of derealization at the time of the offense during either the 9-1-1 call or during her conversation with a detective immediately after her arrest:

"[The prosecutor:] All right. You heard the 9-1-1 call in this case --

"[Dr. Stewart:] Yes.

"[The prosecutor:] -- as part of the materials that were provided to you?

"[Dr. Stewart:] Yes.

"[The prosecutor:] She doesn't mention in that call any sort of comments that would lead you to believe that she was in a state of derealization; right?

"[Dr. Stewart:] In the call, no.

"[The prosecutor:] Okay. And you've heard also the patrol -- we're calling it an interview, but there's a colloquy between her and one of the detectives in the patrol car immediately after the arrest. Do you know what I'm talking about?

"[Dr. Stewart:] I believe she voluntary says something about killing her mother.

"[The prosecutor:] They said, 'It's going to be okay,' and she said, 'It's not okay. I killed my mother.' Do you remember that?

"[Dr. Stewart:] Yes.

"[The prosecutor:] And there's no mention there of any sort of being outside of a body or anything of that sort; correct?

"[Dr. Stewart:] Correct.

"[The prosecutor:] You would agree that those statements came much closer in time to the murder than your conversation with her; correct?

"[Dr. Stewart:] Absolutely.

"[The prosecutor:] So at the time, the events would have been fresh in her mind; correct?

"[Dr. Stewart:] Well, it certainly was closer in time."

d. *The discussion of Smith's* Doyle *objection among the court and counsel outside the presence of the jury*

During the prosecutor's cross-examination of Dr. Stewart, the trial court excused the jury for a recess. During the recess, the following discussion of Smith's *Doyle* objection occurred:

> "[Defense counsel:] I do want to put my objection on the record in regards to questioning of Dr. Stewart about the fact that the first time my client made statements regarding the offense, that went to depersonalization and derealization was when Dr. Stewart talked to her, I believe. It's an error on the prosecution's part to ask questions regarding her assertion of her Fifth Amendment right to remain silent and not talk to the police at the time of the incident, and so asking questions that are posed in that manner opens the door now to, unfortunately, the Defense might having to go into that area.
>
> "[The court:] Okay.
>
> "[The prosecutor:] Your Honor, I do not specifically recall -- I don't believe there is a mention in that -- and I know that Counsel's referring to the questioning of the defendant by Detective [DiGiovanna], in which she invoked and which the People agreed we were not going to use. I don't believe that she says anything about depersonalization or derealization in that conversation. But in any event, I certainly was not referring to that at all. I was specifically referring to the statements that had been admitted here in court which include the 9-1-1 call and the patrol [car] questioning, as well as the defendant's own testimony. I was not making any reference at all to that particular piece of evidence.
>
> "[Defense counsel:] Your Honor, I think posing questions such as, 'This is the first time that Ms. Smith made statements to you in regards to being in a dream-like state,' you know, 'not having control of her mental processes,' that line of questioning, I think, is improper, given the fact that she invoked with the police. I think if those questions were

35

-- if she was interviewed by the police and those questions were posed of her and she hadn't invoked then, she might have made those statements. But the fact that she invoked --

"[The court:] No. I understand your objection. [Dr. Stewart] said that he looked at the police reports. Did the police reports contain the statement that is not -- that the People have indicated they're not using, the one that was made where she did invoke?

"[The prosecutor:] Yes. There is, I think, a summary by Detective [DiGiovanna] in there.

"[The court:] Okay. So [Dr. Stewart] looked in there. And my recollection is that he didn't see any mention of these statements in the police reports or in the 9-1-1 call or her testimony, or -- but he specifically said he did not -- he says, 'I don't remember them in these other things, but I don't know whether or not she has ever made those statements before.'

"[Defense counsel:] Your Honor, I think making any comment on a person's invocation of their Fifth Amendment right, the fact that she previously didn't make a statement when they have invoked, is error. Whether they made any kind of statement during that limited interview by Detective [DiGiovanna], just the reference to it, I believe, is error, and that was the basis for both my objections during the time of questioning.

"[The court:] And I overruled it.

"[Defense counsel:] Yes.

"[The court:] Okay. I still think they should be overruled.

"[Defense counsel:] Okay."

### e. *Dr. Mohandie's testimony*

Dr. Mohandie testified that the first time Smith described being in a state of depersonalization or derealization was several months after the offense.[27]

During defense counsel's cross examination of Dr. Mohandie, the following colloquy occurred:

> "[Defense counsel:] Do you have any evidence in the discovery that you've received indicating that [Smith] checked out some books on mental disorders, specifically depersonalization or derealization or any other mental disorders?
>
> "[Dr. Mohandie:] I don't know anything about that, no.

---

[27] Although not material to Smith's claim, there is some ambiguity in the record as to the amount of time that Dr. Mohandie stated had passed from the commission of the offense to Smith's first disclosure of dissociation. During direct examination, the prosecutor asked Dr. Mohandie to discuss inconsistencies between "information that you learned versus the investigative documents . . . ." Dr. Mohandie responded:

> "Right. Well, basically, the 9-1-1 call in particular, there's a very clear discussion, in my opinion, of a statement, if you will, by Ms. Smith about what happened. There was no evidence whatsoever of any kind of dissociative experience or depersonalization, which is what she's going to say later, the *first time nearly three months later*, and certainly in the interview with me on May 2nd of this year; so that's a very significant inconsistency, that particular fact.
>
> "And there's no behavioral evidence of it during that 9-1-1 call, no references to anything that would be like that; rather, it was quite the opposite, sort of lucid, it was very present, it was very emotion-laden, which is not what you would see." (Italics added.)

However, on cross-examination, Dr. Mohandie indicated that Smith's first disclosure had occurred a "*year* and three months," after the offense. (Italics added.)

"[Defense counsel:] So you don't have any basis for your claim that you think she made this up afterwards?

"[Dr. Mohandie:] Well, the basis is -- I do have a basis. The basis is that she's reporting a disorder that is not realistically being reported in terms of how these things happen, that is inconsistent with the behavioral and emotional evidence, as I see it, and that there was no contemporaneous -- that is at the time or around the time -- evidence of it, and it doesn't appear until the year and three months later. That is the basis of my finding.

"[Defense counsel:] And you're aware that that's the first time that she speaks to a psychiatrist; is that correct, about her case?

"[Dr. Mohandie:] It may be.

"[¶] . . . [¶]

"[Defense counsel:] Okay. And when she's arrested and she is charged with a crime and provided an attorney, at that point, she's not allowed to be interviewed, is that fair to say, without the consent of her attorney?

"[Dr. Mohandie:] You mean after she invoked?

"[Defense counsel:] If an individual is arrested, charged with a crime, and given an attorney, no one is allowed to interview her at that point; correct?

"[Dr. Mohandie:] True.

"[Defense counsel:] And so between that time and the time that Dr. Stewart met with her, there was no opportunity for her to provide a statement to anyone except her attorney; is that correct?

"[Dr. Mohandie:] In terms of an official statement, sure. Agreed."

f. *Smith's request for a pinpoint instruction and motion for a mistrial*

During a hearing outside the presence of the jury the following day, the trial court indicated that defense counsel had stated in chambers that she believed that Dr. Mohandie's reference to Smith having invoked her right to counsel was a violation of a court order because, just prior to having made that statement, Dr. Mohandie had been admonished by counsel outside the presence of the jury not to refer to Smith's statements to the police after she had invoked her right to counsel.[28] Defense counsel stated the following:

> "I'm asking the Court specifically for a pinpoint instruction indicating that the witness for the prosecution intentionally violated instructions from the judge. I didn't indicate 'court order,' and that was the instructions you gave us in the hallway to go outside, talk to him, let him know not to

---

[28] Specifically, the trial court stated that defense counsel believed that Dr. Mohandie's reference to Smith's invocation violated a court order as follows:

> "You believe that that was a violation of a court order because prior to that time, we had a discussion in the hallway where we reaffirmed that the statements that Ms. Smith made to police officers at the police station, not the one that was referred to in the car at the scene, but those statements were potentially a violation of *Miranda.* We didn't really necessarily get to that because both counsel agreed that the [prosecutor] agreed he was not going to try and introduce that. [¶] . . . [¶] So I don't know that there was a specific ruling on it, but I'm satisfied that both the parties believe that it was a violation of *Miranda.* And we reaffirmed in the hallway that he would not refer to that, and then I came out, told [Dr. Mohandie] to go out into the hallway with counsel, and I wasn't present, but apparently that was told to [Dr. Mohandie], and then he came back and it was after that that [Dr. Mohandie] made this statement," about Smith invoking.

39

discuss anything in regards to the statements that Ms. Smith made to the police because it was a violation of her right when she invoked.

"I also asked the Court to -- well, let me read the statement in its entirety. 'The witness for the prosecution intentionally violated instructions from the judge. You can consider that fact when evaluating what weight to give to this witness's credibility and testimony in this case. And, furthermore, you should not consider any evidence regarding Linde Smith's timing of her disclosures of depersonalization and derealization episode.'

"And in regards to the last point, Your Honor, we've had multiple conversations regarding statements that have been made -- or questions that have been asked in cross-examination of my witnesses as well as statements made by the prosecution witness that her -- Linde Smith's reported symptoms regarding depersonalization and derealization were actually a year and three months later, and therefore, they're suspect. I believe, as I had previously indicated to the Court, that that was *a Doyle* error, and it is in violation of the Fourteenth Amendment, due process rights of my client, as well as the *Doyle* case, 426 U.S. 610.

"I am requesting that the Court consider a mistrial, given the fact that Dr. Mohandie made a statement regarding invocation, and made several statements regarding the fact that Linde Smith disclosed the statement a year and three months later when she had, in fact, invoked her right to remain silent."

The prosecutor objected to the giving of the instruction and argued that there had been no *Doyle* violation. After further discussion from the prosecutor and the defense, the trial court ruled as follows:

"All right. Couple things. No. 1, with regard to the request for a pinpoint instruction, and that instruction which is Court Exhibit 1, I denied it as written, and for [a] number of reasons, one of which being that I do not believe that I

40

have sufficient proof that the witness intentionally violated an instruction from the judge.

"Also, the instruction says that you should not consider any evidence regarding Linde Smith's timing of her disclosures of depersonalization and derealization episode as part of that instruction, and I think that's contrary to the evidence and goes far beyond what he said.

"I did propose that I would read the following, quote, 'When Dr. Mohandie, in response to a question by defense counsel, asked, quote, "you mean after she invoked," end quote, that comment was an improper reference to the defendant's actions and contrary to an agreement by the parties after a discussion with the Court. You may not consider, for any purpose, whether the defendant invoked any right, and you may not consider the doctor's comment for any reason.'

"Counsel opted not to allow that -- or not to have that read to the jury."

Defense counsel responded that the reason she had rejected the trial court's offer to provide its proposed instruction was that the court's proposed instruction highlighted the issue of invocation, while the defense's proposed instruction was "more vague."

The court interjected:

"That's fine. That was another reason for denying the pinpoint instruction[,] the fact that it has no context. It simply says, 'The witness for the prosecution intentionally violated instructions from the judge.' It doesn't tell the jury what particular instructions of the Court were violated, and I think that is misleading as well."

The court also denied the defense's request for a mistrial.

### g. *The prosecutor's closing argument*

During the prosecutor's closing argument, the prosecutor argued that it was important for the jury to view Smith's interview with Dr. Mohandie in

41

part because "it shows [the jury] the progression of her made-up story, okay?" The prosecutor continued:

> "When [Smith] first tells 9-1-1 what happened, she hasn't yet thought of this idea of being outside a car and not being in her own body, okay? She only adds that later when she meets Dr. Stewart, okay?
>
> "By the time the defendant got to court here and testified before you, the day that she was examined and was cross-examined by me, the story was complete. All the parts were there."

### 2. *Governing law*

In *Doyle, supra*, 426 U.S. 610, the United States Supreme Court held that "the use against defendant of a postarrest invocation of rights following a *Miranda* admonition violates due process." (*People v. Thomas* (2012) 54 Cal.4th 908, 936, citing *Doyle, supra*, 426 U.S. at p. 619.) The *Doyle* court reasoned, "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle, supra*, at p. 618.)

In *Wainwright v. Greenfield* (1986) 474 U.S. 284, the United States Supreme Court extended *Doyle* and held that the prosecution's use of the defendant's post-*Miranda* silence to demonstrate a defendant's sanity is improper. (*Id.* at p. 292.) In *Wainwright*, two police officers testified that shortly after his arrest, the defendant had twice exercised his right to remain silent and his desire to consult with counsel before answering any questions. (*Id.* at pp. 286–287.) During closing argument, "the prosecutor reviewed the testimony of [the officers] and suggested that [defendant's] repeated refusals

42

to answer questions without first consulting an attorney demonstrated a degree of comprehension that was inconsistent with his claim of insanity." (*Id* at p. 287.) The *Wainwright* court held that this testimony and argument was improper under *Doyle*, reasoning:

> "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity." (*Wainwright, supra*, at p. 292.)

"But this does not mean that it always is error to permit evidence that a defendant exercised his right to counsel." (*People v. Huggins* (2006) 38 Cal.4th 175, 198.) "To establish a violation of due process under *Doyle,* the defendant must show that the prosecution inappropriately used his postarrest silence for impeachment purposes and the trial court permitted the prosecution to engage in such inquiry or argument. [Citations.] . . . An assessment of whether the prosecutor made inappropriate use of defendant's postarrest silence requires consideration of the context of the prosecutor's inquiry or argument. [Citation.] A violation of due process does not occur where the prosecutor's reference to defendant's postarrest silence constitutes a fair response to defendant's claim or a fair comment on the evidence. [Citations.] ' . . . *Doyle's* protection of the right to remain silent is a "shield," not a "sword" that can be used to "cut off the prosecution's 'fair response' to the evidence or argument of the defendant." [Citation.]' " (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1448 (*Champion*).)

In addition, a prosecutor does not violate *Doyle* by inquiring about prior voluntary statements that a defendant has made. (*Anderson v. Charles* (1980) 447 U.S. 404, 409 (*Anderson*) [where "questions were not designed to

draw meaning from silence, but to elicit an explanation for a prior inconsistent statement," *Doyle* is not violated].)  As the *Anderson* court explained:

> "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. . . .  As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson, supra*, at p. 408.)

3.  *Application*

Smith argues, "In violation of *Doyle*, the prosecution's questions and the resulting testimony, as well as Dr. Mohandie's testimony, suggested that [Smith's] claim of depersonalization or derealization was fabricated because she did not mention it after invoking her right to silence under the Fifth and Fourteenth Amendments," until speaking with mental health experts more than a year after the offense.  We are not persuaded.

We first consider the prosecutor's cross-examination of Dr. Stewart. Dr. Stewart testified on direct examination that he relied on "[p]olice reports . . . [and] the Santa Clara County Jail medical and psychiatric records," in conducting his psychiatric evaluation of Smith.  Dr. Stewart also testified at length about the content of Smith's jail psychiatric records.  Given Dr. Stewart's testimony that he relied on "police reports," and "jail records," it was not *Doyle* error for the prosecutor to ask Dr. Stewart whether there were any statements in the "jail records" and "police reports" indicating that Smith had referenced "this idea of being outside of herself or being in a car or not acting within herself."  *Doyle* is based on the idea that it is "fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle, supra*, 426 U.S. at p. 618.)  However, the fundamental fairness concerns

44

animating *Doyle* and its progeny do not prohibit a prosecutor from cross-examining a defense expert about whether there are statements to support his opinion in the documents on which the defense expert has expressly stated that he relied. To conclude otherwise would be to allow the defendant to use " 'the right to remain silent . . . [as] a "sword" . . . to "cut off the prosecution's 'fair response' to the evidence or argument of the defendant." ' " (*Champion, supra*, 134 Cal.App.4th at p. 1448.) *Doyle* is not to be applied in such an instance.

This is particularly so given that the prosecutor's questions did not make any specific reference to the police interview during which Smith apparently invoked her right to remain silent.[29] Instead, and in considering the "context of the prosecutor's inquiry" (*Champion, supra*, 134 Cal.App.4th at p. 1448), we note that the specific statements of Smith that the prosecutor *did* reference were Smith's 9-1-1 call and her conversation with a detective immediately after her arrest. The prosecutor did not violate *Doyle* by asking Dr. Stewart whether Smith had mentioned depersonalization when making these statements. (See *Anderson, supra*, 447 U.S. at p. 408 ["*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements"].)

Similarly, the gist of Dr. Mohandie's testimony and the prosecutor's closing argument that Smith references on appeal was that Smith's claim of depersonalization lacked believability because her claim was inconsistent with voluntary statements that she made near the time of the offense. (See pt. III.D.1.e. and pt. III.D.1.g, *ante*.) For example, Dr. Mohandie noted that there was "no evidence whatsoever of any kind of dissociative experience or depersonalization," in Smith's 9-1-1 call. Similarly, during his closing

---

[29] A transcript of the interview is not in the record.

45

argument, the prosecutor argued that when Smith "first tells 9-1-1 what happened, she hasn't yet thought of this idea of being outside a car and not being in her own body," and that Smith "only adds that later when she meets Dr. Stewart . . . ." Arguing such inconsistencies does not constitute *Doyle* error. (See *Anderson, supra*, 447 U.S. at p. 408.) Further, neither Dr. Mohandie nor the prosecutor *ever* stated or suggested that Smith's testimony was unbelievable because she had invoked her right to remain silent during a police interview.

In addition, Dr. Mohandie's mention of Smith's invocation of her *Miranda* rights during defense counsel's cross-examination did not constitute *Doyle* error or warrant the granting of a mistrial. While defense counsel argued that Dr. Mohandie's reference constituted an intentional violation of the trial court's instructions, the record does not contain the precise admonishment that Dr. Mohandie received prior to providing this testimony. (See fn. 28, *ante*.) Further, the trial court could have reasonably found that Dr. Mohandie's reference to Smith's invocation reflected a good faith attempt to answer defense counsel's question.[30] In sum, the trial court reasonably determined that it lacked "sufficient proof that the witness intentionally violated an instruction from the judge." Further, the trial court's offer to provide an admonishment to the jury was a reasonable approach to cure any potential prejudice from Dr. Mohandie's statement. And, while defense

---

[30] As noted in part III.D.1.e, *ante*, Dr. Mohandie referenced Smith's invocation of her *Miranda* rights during the following colloquy:

> "[Defense counsel:] Okay. And when she's arrested and she is charged with a crime and provided an attorney, at that point, she's not allowed to be interviewed, is that fair to say, without the consent of her attorney?

> "[Dr. Mohandie:] You mean after she invoked?"

46

counsel acted reasonably in making the tactical decision to decline the trial court's offer to provide such admonishment, the trial court was not obligated to grant a mistrial based on Dr. Mohandie's mere mention of Smith's having "invoked."  This is particularly true given that Dr. Mohandie *agreed* with defense counsel that Smith had not had an opportunity to make an "official statement" between the time she was provided with an attorney and the time that Dr. Stewart interviewed her.  Finally, the trial court provided a reasoned explanation for denying defense counsel's requested pinpoint instruction, i.e., the instruction was vague and unsupported by the evidence.

Accordingly, we conclude that the trial court did not violate Smith's constitutional right to due process under *Doyle* and its progeny.

E.  *The trial court did not abuse its discretion or violate Smith's constitutional rights by refusing to preclude Dr. Mohandie from testifying during the sanity phase due to the People's alleged failure to timely provide the defense with Dr. Mohandie's report and testing data*

Smith claims that the trial court abused its discretion and violated her constitutional rights in denying her request to preclude Dr. Mohandie from testifying during the sanity phase due to the People's alleged failure to timely provide the defense with Dr. Mohandie's report and testing data.

A trial court's discovery rulings, including its resolution of claims pertaining to the prosecution's alleged failure to timely comply with its discovery obligations, are reviewed for abuse of discretion.  (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 466 (*Mora and Rangel*).)  We review Smith's constitutional claims de novo.  (See *People v. Salazar* (2005) 35 Cal.4th 1031, 1042 [*Brady* claim is reviewed de novo]; *People v. Cromer* (2001) 24 Cal.4th 889, 901 [reviewing courts ordinarily apply independent review of constitutional claims involving mixed questions of fact and law].)

47

1. *Factual and procedural background*

    a. *General background*

Smith was arrested on August 13, 2015. She pled not guilty and not guilty by reason of insanity in May of 2017, at which time the trial court appointed two doctors, Drs. Cohen and Burke, to evaluate her. Dr. Cohen submitted a report to the court in November 2017. The following month, Dr. Berke submitted a report to the court. In their reports, both doctors opined that Smith was insane at the time of the offense.

The People retained Dr. Mohandie in January 2018. On April 18, Smith withdrew her time waiver and the matter was set for trial, to commence on May 21, 2018.

Dr. Mohandie interviewed Smith on May 2 and 7.

On May 21, and on several dates thereafter, the matter was continued. On June 1, the matter was set for trial to commence on June 6.

Dr. Mohandie e-mailed the prosecutor his report on June 1. The prosecutor provided Dr. Mohandie's report to defense counsel that same day.

b. *Smith's motion to preclude Dr. Mohandie from testifying*

Smith filed a motion in limine on June 6 requesting that the trial court prohibit the prosecution from calling Dr. Mohandie as a witness. Smith recounted the background of the case, including the facts pertaining to Dr. Mohandie's retention by the prosecution, and Dr. Mohandie's interview of Smith on May 2 and 7. Defense counsel requested that the court preclude Dr. Mohandie from testifying pursuant to section 1054.5, subdivision (b).[31]

---

[31] Section 1054.5, subdivision (b) provides a list of possible remedies for failure to comply with California statutory discovery provisions, including "delaying or prohibiting the testimony of a witness or the presentation of real evidence."

On June 8, defense counsel filed a declaration in support of her motion to preclude Dr. Mohandie from testifying. Defense counsel stated that on June 4 and June 5, she had contacted three psychologists to potentially retain to review Dr. Mohandie's report and data from the psychological testing that he had performed. Defense counsel indicated that two of the psychologists had been unable to assist the defense, given time constraints due to the imminence of the pending trial. One psychologist stated that he would be unable to assist because he was on vacation. Defense counsel stated that Dr. Mohandie still had not released the "raw data" related to the psychological testing and noted that Dr. Mohandie would release the data only to a defense retained psychologist.

The People filed a motion and supporting declaration pertaining to their request that Dr. Mohandie be allowed to testify. In the supporting declaration, the prosecutor provided a timeline of the events between Dr. Mohandie's retention in January 2018 to Dr. Mohandie's production of his report on June 1, 2018. The timeline noted that the manner by which Dr. Mohandie would be permitted to examine Smith was litigated throughout early 2018, including whether the examination would be videotaped, the types of psychological testing that would be permitted, and whether defense counsel would be allowed to be present for the examination. The prosecutor also noted that Dr. Mohandie had examined Smith on May 2 and 7, 2018, and that it had taken Dr. Mohandie "24 days to complete a 57-page report," which was provided to the defense on June 1. The People contended that they had "acted diligently and Dr. Mohandie acted diligently and reasonably, in completing the examination of defendant Smith."

The trial court held a hearing on the motion. At the June 8 hearing, defense counsel acknowledged that the prosecutor had "forward[ed] the information [from Dr. Mohandie] as soon as they received it," but argued that

49

the production "was not only untimely but extremely prejudicial." Defense counsel emphasized that she had not been able to retain a psychologist to review the psychological testing performed by Dr. Mohandie. Counsel also argued that the People had delayed too long in hiring Dr. Mohandie.

The prosecutor responded by arguing that it was not until two court appointed doctors, Drs. Cohen and Berke, had completed their reports in late 2017 that the People retained a psychologist. The prosecutor argued "we were waiting for the . . . appointed doctors to come back with their recommendations," which the prosecutor characterized as "normal." Thereafter, the prosecutor recounted various proceedings that were required in order for Dr. Mohandie to perform his evaluation, and argued, "[B]ottom line . . . is that in my opinion Dr. Mohandie acted diligently and reasonably in setting up the interviews, conducting the examination of the defendant, and producing the report, and that was provided to the defense just as [defense counsel] stated."

The court stated that it had discussed the case in chambers with counsel, including the fact that the matter had "proceed[ed] [on] a time waived basis until April of 2018, and at that time[,] the time waiver was withdrawn." However, the court noted that after the withdrawal of the time waiver, the defense had agreed to Dr. Mohandie's examinations. The court ultimately denied the motion to preclude Dr. Mohandie from testifying. The court also ruled that Dr. Mohandie would be permitted to rely on the results of the psychological testing that he had performed and ordered the prosecutor to tell Dr. Mohandie to provide the raw data from the psychological testing to any psychologist identified by the defense. The court further noted that it had offered to continue the trial to give the defense time to retain a psychologist, but the defense had indicated that it wished to proceed.

50

After the trial court ruled, defense counsel stated that she wanted to preserve her objection, raised in chambers, that failing to preclude Dr. Mohandie from testifying would deny Smith the effective assistance of counsel. Defense counsel, added, "I also wanted the Court to know that I believe it's a violation of . . . both her state and federal due process rights."

### c. *Relevant trial proceedings*

During the sanity phase of the trial, Dr. Cohen testified[32] that she was familiar with two psychological tests that Dr. Mohandie had administered to Smith—the Structured Interview of Reported Symptoms (SIRS) and the Minnesota Multi-phasic Personality Inventory-II (MMPI-II). She explained the ways in which the SIRS test functions and the ways in which it is used to detect malingering. She was "very familiar" with the MMPI-II, and discussed its use, scoring, and functions at length. In addition, Dr. Cohen testified that Dr. Mohandie had sent her Smith's MMPI-II and SIRS test data and she had reviewed in detail Smith's scores on various components of the MMPI-II. Dr. Berke also testified and explained that Smith had no scores in either the "definite" or "probable feigning" range on the SIRS test.

The defense also cross-examined Dr. Mohandie[33] at length pertaining to both the SIRS and the MMPI-II tests. Dr. Mohandie agreed with defense counsel that Smith's SIRS test "came back as her being honest." Dr. Mohandie also stated that the MMPI-II test validated his diagnosis of "major depression."

---

[32] Dr. Cohen testified on July 3, 2018, nearly one month after the court's June 8, 2018 hearing on Smith's motion to preclude Dr. Mohandie from testifying.

[33] The cross-examination occurred on July 5, 2018.

At the conclusion of the sanity phase of the trial, outside the presence of the jury, the trial court stated that it was denying a defense request for a jury instruction pertaining to the untimely disclosure of evidence. The court said that the primary reason that it was denying the request was because the court had offered to continue the trial to permit the defense additional time to respond to Dr, Mohandie's report and the defense had declined the court's offer.

2. *Governing law*

Section 1054.1 outlines a prosecutor's discovery obligations and provides in relevant part:

> "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies:

> "[¶] . . . [¶]

> "(e) Any exculpatory evidence.

> "(f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."

Section 1054.7 provides the time frame within which discovery disclosures must be made and provides in relevant part:

> "The disclosures required under this chapter shall be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. If the material and information becomes known to, or comes into the possession of, a party within 30 days of

52

trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred."

Section 1054.5 prescribes various remedies that a court may employ for a discovery violation in relevant part as follows:

"(b) . . . Upon a showing that a party has not complied with Section 1054.1 . . . and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure.

"(c) The court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted. The court shall not dismiss a charge pursuant to subdivision (b) unless required to do so by the Constitution of the United States."

In *People v. Lewis* (2015) 240 Cal.App.4th 257 (*Lewis*), the Court of Appeal summarized the relevant law governing a claim under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*):

"Under *Brady*, the prosecution violates a defendant's federal due process rights when it suppresses evidence material to the defendant's guilt or punishment, regardless of the good faith belief of the prosecution. (*Brady, supra*, 373 U.S. at p. 87.) Prosecutors have a duty to disclose 'material exculpatory evidence whether the defendant makes a specific request [citation], a general request, or none at all [citation].' [Citation.] There are three elements to a *Brady* violation: (1) the state withholds evidence, either willfully or inadvertently, (2) the evidence at issue is favorable to the defendant, either because it is exculpatory

53

or impeaching, and (3) the evidence is material.  [Citation.]"
(*Lewis, supra*, at p. 263.)

"Evidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously disclosed during discovery."  (*Mora and Rangel, supra*, 5 Cal.5th at p. 467.)

3.  *Application*

It is undisputed that the prosecutor disclosed Dr. Mohandie's report to defense counsel on the same day that the prosecutor received the report.[34] Thus, the prosecutor complied with section 1054.7.  (See § 1054.7 ["If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately"].) While Smith asserts that Dr. Mohandie was "an auxiliary service for the prosecutor, and thus part of the prosecution," she fails to cite any case law supporting the proposition that a retained expert is considered a component of the prosecution for purposes of section 1054.7.  Further, even assuming that Dr. Mohandie could be considered "a party" for purposes of section 1054.7, Smith makes no showing that Dr. Mohandie failed to disclose the report as soon as he prepared it.  Thus, we see no basis for concluding that the trial court erred in refusing to preclude Dr. Mohandie from testifying based on the failure to timely disclose his report.  (See, e.g., *People v. Panah*

---

[34]  In addition, although Smith appears to base her claim in part on the alleged late disclosure of Dr. Mohandie's test data, Smith does not point to any evidence in the record indicating precisely when Dr. Cohen received the data.  However, Dr. Cohen testified at trial about her review of the "raw data that was sent to [her] by [Dr. Mohandie]," and she testified that "[l]ooking at the MMPI[-II] -- really, you know, looking at it in detail, confirmed my opinion."  In short, Smith fails to demonstrate on appeal that any delay in sending the data to Dr. Cohen impeded Dr. Cohen's ability to conduct an analysis of the data.

(2005) 35 Cal.4th 395, 460 (*Panah*) [concluding that prosecution's disclosure of coroner's report prepared within 30 days of trial was timely under discovery statutes].)

We are similarly unpersuaded by Smith's assertion that the trial court should have employed the drastic sanction of precluding Dr. Mohandie from testifying because the late discovery of the report was allegedly based on the prosecution's delay in retaining Dr. Mohandie and "permitting such a deliberate evaluation process." The trial court could have reasonably determined that the prosecution retained Dr. Mohandie in a timely matter, shortly after the court appointed experts had submitted their reports opining that Smith was insane at the time of the charged offense. Further, the trial court could also have reasonably determined that the approximately four-month period between the time that the People retained Dr. Mohandie and the time that he interviewed Smith was not unduly long in light of litigation concerning the scope of his examination, as well time that Dr. Mohandie could reasonably have been expected to need to prepare for the examination. In addition, the record indicates that Dr. Mohandie completed his report in a timely matter, less than a month after interviewing Smith. In sum, the trial court did not abuse its discretion in denying Smith's motion to preclude Dr. Mohandie from testifying given the absence of any demonstration that the prosecutor violated section 1054.7.

We also reject Smith's *Brady* claim, given her failure to make any showing that Dr. Mohandie's report was suppressed. (See *Lewis, supra*, 240 Cal.App.4th at p. 263 [first element of a *Brady* claim is that "the state withholds evidence, either willfully or inadvertently"].) As discussed *ante*, the prosecutor provided the defense with Dr. Mohandie's report on the same day that the prosecutor received it, which was nearly a month prior to defense counsel's cross-examination of Dr. Mohandie and presentation of

55

expert testimony evaluating Dr. Mohandie's report. (See *Mora and Rangel, supra*, 5 Cal.5th at p. 467 [noting that evidence presented at trial is not considered to have been suppressed, particularly where defendant has not made a showing that any delay in disclosure prevented defense counsel from effectively preparing and presenting a defense].) Finally, in light our conclusion that the trial court did not err in determining that the prosecutor had not violated California's statutory discovery law or *Brady*, and after consideration of Smith's presentation of a defense during the sanity phase of the trial, including her counsel's extensive cross-examination of Dr. Mohandie and presentation of Dr. Berke and Dr. Cohen's testimony with respect to Dr. Mohandie's psychological testing, we reject Smith's contention that "[l]ate disclosure also deprived [Smith] of an adequate opportunity to present a complete defense and for counsel to be effective at trial."[35] (Cf. *People v. Thompson* (2016) 1 Cal.5th 1043, 1105 ["the proper exercise of a trial court's discretion under section 1054.7 does not violate a criminal defendant's confrontation or due process rights"]; *Panah, supra*, 35 Cal.4th at p. 460 ["we reject the edifice of constitutional error that defendant constructs upon his claim of discovery violation"].)

Accordingly, we conclude that the trial court did not abuse its discretion or violate Smith's constitutional rights by refusing to preclude Dr. Mohandie from testifying due to the People's alleged failure to timely provide Dr. Mohandie's report and testing data.

---

[35] While Smith argues that the "defense was not prepared" to attack Dr. Mohandie's opinion, she fails to address specifically what testimony or evidence defense counsel could have presented if Dr. Mohandie's report and data had been provided to the defense earlier.

F.  *Smith is not entitled to reversal of the sanity verdict pursuant to the cumulative error doctrine*

As with the guilt phase, Smith contends that the cumulative effect of the errors that she alleges occurred during the sanity phase requires reversal of the sanity verdict.  We have found no errors to cumulate.  Accordingly, we conclude that the cumulative error doctrine does not require reversal of the sanity verdict.

IV.
DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.